UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,

06 Cr. 0121 (CLB)

- against -                                       ***Memorandum and Order***

PAUL M. COTE,

Defendant.
--------------------------------------------------------x
Brieant, J.

 Before this Court for decision following a seven day jury trial concluded on September

20, 2006, are motions by the Defendant pursuant to Rule 29(c) and Rule 33 of the Federal Rules

of Criminal Procedure ("F.R.Crim.P."), seeking a judgment of acquittal and an additional

determination for a new trial, should the judgment of acquittal be denied, or if granted, later

vacated or reversed.  *See* F.R.Crim.P. Rule 29(d)(1).

 Defendant was convicted on a single count Indictment, charging a violation of 18 U.S.C.

§ 242.  The Indictment recites that Defendant at relevant times was employed as a Correction

Officer at the Westchester County Department of Correction in Valhalla, New York; that

Zoran Teodorovic was a pre-trial detainee in the custody of the Westchester County Department

of Correction on October 10, 2000; and also alleges that:

> On or about October 10, 2000, Paul M. Cote, the defendant, while employed as a
> Correction Officer at the Westchester County Department of Correction in Valhallla,
> New York, and while acting under color of the laws of the State of New York, did
> willlfully strike, kick, stomp, and otherwise assault Zoran Teodorovic *while
> Teodorovic was restrained and under the physical control of another Correction
> Officer*, resulting in bodily injury to Zoran Teodorovic, and did thereby willfully
> deprive Zoran Teodorovic of rights and privileges secured and protected by the
> Constitution and laws of the United States, to wit, the right of Zoran Teodorovic

-1-

not to be deprived of liberty without due process of law, which includes the right to be free from excessive force amounting to punishment by one acting under color of law.

*Indictment ¶3* (emphasis added).

Section 242 of Title 18 of the United States Code is the criminal analog of 42 U.S.C. §1983, and reads in relevant part as follows:

Section 242 - Deprivation of Rights under Color of Law

Whoever, under color of any law, statute, ordinance, regulation or custom *willfully* subjects any person in any State, Territory, Commonwealth, Possession or District to a deprivation of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States. . .shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section. . .shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section. . .shall be fined under this title or imprisoned for any term of years or for life or both, or may be sentenced to death.

18 U.S.C. §242 (emphasis added).  Specific criminal intent to engage in conduct having the effect of depriving a person of a federal right is an essential element of this crime.  *See United States v. McClean*, 528 F.2d 1250, 1255 (2d Cir. 1976); *Screws v. United States*, 325 U.S. 91, 106 (1945).

Counsel for Defendant have mounted a broad attack on the verdict, based on different discrete theories and contentions, some of which, although not presently supported by the caselaw in this Circuit, are supported by non-frivolous arguments for the modification of existing law or the establishment of new law.  The Court finds the verdict in this case deeply troubling on more than one level of consideration, and for the reasons set forth below, grants the motion for a

judgment of acquittal, and conditionally grants the motion for a new trial, within the provisions

of Rule 29(d).

> Rule 29 created the judge-ordered "judgment of acquittal" in place of the directed verdict, which was at least fictionally returned by the jury at the judge's direction, rather than coming from the judge alone. But, we said in *Martin Linen* [430 U.S. 564 (1977)], change in nomenclature and removal of the jury's theoretical role make no difference; the Rule 29 judgment of acquittal is a substantive determination that the prosecution has failed to carry its burden.

*Smith v. Massachusetts,* 543 U.S. 462, 468 (U.S. 2005).

> Rule 33 [] states that "the court may grant a new trial to [a] defendant if the interests of justice so require." Fed. R. Crim. P. 33. The rule by its terms gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). The district court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurping" the role of the jury. *[United States v.] Autuori*, 212 F.3d [105], 120 [2d Cir. 2000]. Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, "it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez*, 969 F.2d at 1414. An example of exceptional circumstances is where testimony is "patently incredible or defies physical realities," although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief. *Id.*

*United States v. Ferguson*, 246 F.3d 129, 133-134 (2d Cir. 2001). "The ultimate test on a Rule

33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Id. at 134.*

The standard for the granting of a new trial is less rigorous than for judgment of acquittal

notwithstanding the verdict, because in connection with Rule 33, the Court may consider the fact

that the verdict was contrary to the weight of the evidence, and may also deal more freely with

issues of credibility and the inferences to be drawn from the proof at trial.  "[A] trial court has

broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment

of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must

be assumed." *Sanchez*, 969 at 1414 (citations omitted).

> Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted.

*Id*.

The Court begins with a recital of several of the procedural facts relevant to the issues raised in the motions, and follows with the facts specific to the October 10th incident for which Defendant was convicted.

*Procedural Background*

On November 20, 2000, the FBI opened an investigation into the allegation that defendant Cote had used excessive force against the person of Teodorovic while assisting Officer Reimer obtain control of the prisoner on October 10, 2000. Some five days earlier, the District Attorney's Office of Westchester County obtained an Indictment charging Paul Cote with assault arising out of the same facts. Thereafter, Special Agent Pamela A. McGovern of the FBI "monitored" the local prosecution which was handled by Assistant District Attorney Robert Neary, now a Judge of the New York Court of Claims. Reimer became a cooperating witness for the District Attorney and later for the Government in this case. He was granted immunity to testify against Cote in the New York Grand Jury. On May 17, 2001, ADA Neary reported to FBI Agent McGovern that "Mr. Teodorovic is still in a coma and is not likely to recover."

On July 13, 2001, a trial jury before Justice Perone in Westchester County Supreme Court acquitted Mr. Cote of the highest charge in the Indictment, Intentional Assault, but found him guilty of the lesser included offense of Reckless Assault against Teodorovic.  The evidence and the witnesses in the state trial were substantially the same as those in this case.  The New York Presentence Report recommended a non-custodial sentence.  On September 20, 2001, Cote was sentenced to three months imprisonment and 100 hours of community service for the crime of Reckless Assault, in connection with the October 10, 2000 incident.  His employment with the County was terminated.  No appeal was taken and Mr. Cote served the sentence imposed upon him by the State of New York.  On December 19, 2001, the FBI ordered a copy of the trial transcript of the state court proceeding.

On December 21, 2001, about fourteen months after his injuries were incurred, Zoran Teodorovic died.  Following the autopsy, the Westchester County Medical Examiner certified the cause of death as "brain trauma with anoxic cerebral necrosis followed by fourteen months survival and persistent vegetative state (clinical) with chronic respiratory failure; sepsis and pneumonia.  Homicidal assault.  Homicide."

Immediately following Cote's sentencing by the state court, the U.S. Attorney's Office, which had been "monitoring" the state court proceedings through the FBI, did nothing.  On May 2, 2002, the then attorney for Cote informed Assistant United States Attorney ("AUSA") Neil M. Corwin that he had learned that Mr. Cote was the subject of a Federal inquiry and

requested an opportunity to meet with the Government for the purpose of attempting to persuade the Government not to seek a Federal Indictment.[1]  This telephone call was confirmed by letter also dated May 2, 2002.  *See Corwin Decl., Exh. A*.

Mr. Corwin did not meet with the attorney, and ceased to serve as Chief of the Civil Rights Unit of the U.S. Attorney's Office for this District in April 2003.  His successor was AUSA Andrew W. Schilling, who participated in the trial before this Court.  The record shows that from May 2002 to July 2005, nothing further happened until July 14, 2005, when Mr. Schilling was notified by the Department of Justice Trial Attorney assigned to the case, that the case was being closed. *See Schilling Decl.,* ¶ 8.  Mr. Schilling reports that the Trial Attorney offered to send out a routine closing notification letter.  On July 26, 2005, Schilling advised Cote's then attorney "that the investigation was closed and that accordingly there was no need for the meeting he had requested in his letters." *Id* at ¶ 9.

Not content to leave sleeping dogs lie, the attorney initiated a call, which Mr. Schilling returned on August 9, 2005, in which the attorney asked for a letter confirming that the investigation was closed.  On that date, Mr. Schilling contacted the assigned Trial Attorney in the Department of Justice, and conveyed this request. *Id. at ¶ 10*.  The Trial Attorney then informed Schilling, contrary to what he was previously told, that the matter was still under review.  Sometime thereafter, the U.S. Attorney's Office in this District, was advised by the

---

[1] This information apparently came from the newspaper.

Civil Rights Division in Washington of its decision that an Indictment should be sought in the case, and on October 3, 2005, Mr. Schilling was informed for the first time that the U.S. Attorney in this District concurred.  Mr. Schilling contacted the Defendant's then attorney on the same day.  In that conversation, he advised the attorney that he had been "mistaken" when he advised him that the investigation was closed.

Because the statute of limitations would expire on Friday, October 7, 2005, Mr. Schilling, that same day (October 3, 2005), directed Assistant United States Attorney Ramon Reyes to contact Cote's then attorney to "request"a tolling agreement.  This agreement, the first of two, was initiated by the Government.  Schilling informed Reyes that "in the event that [the attorney] did not agree to enter into a tolling agreement, time should be reserved in the Grand Jury for later that week so that we would retain the option of seeking an Indictment before the five year statute of limitations would run."  *Id*. at ¶ 15.  Time was reserved in the Grand Jury for the morning of Thursday, October 6, 2005, in the event that the tolling agreement would be refused.

The Government agreed as consideration for the tolling that it would not seek to claim that death resulted from the acts charged. On October 6th, the last day before the statute would have run, Cote and his then attorney signed the first of two tolling agreements, terminating on January 5, 2006.  There are disputed issues surrounding the first tolling agreement, which are discussed below.  Under the circumstances, it is far from certain that an Indictment could have been obtained in such short order if the tolling agreement had been refused.  There was the possibility that the Grand Jury would lack a quorum due to illness or absence of Grand Jurors, or

that the assigned FBI Special Agent, who would presumably give the Grand Jury a hearsay report of what had happened to Teodorovic, would be unavailable to read from the 302's.

After the first tolling agreement was signed, meetings took place locally at which Cote's then attorney attempted to convince the Government that his client should not be re-prosecuted. The second tolling agreement "for the period beginning January 5, 2006 and terminating ninety days thereafter on February 15, 2006 [sic]" was sought by Defendant on December 8, 2005. *See Schilling Decl., Exh. J.* No issue is raised as to the validity or propriety of that second tolling agreement. The Indictment was filed February 6, 2006.

*Factual Background*

The Court now states the facts developed and proved at trial viewed most favorably to the Government, together with prior facts of record which bear upon the interests of Justice in this case.

On October 10, 2000, during the 3:00 P.M. to 11:00 P.M. shift, two Correction Officers were in charge of the 1-G Housing Unit at the Westchester County Jail in Valhalla, New York. One was Correction Officer John Mark Reimer, the Government's key witness in this trial, and the other was Correction Officer Meade. The 1-G Housing Unit has twenty-eight (28) individual cells, fourteen (14) on the West side of the hallway or tier, and fourteen (14) on the other. The doors to the cells are controlled by electric sliding doors separately operated by switches located

in the so-called "Bubble," or Security Control Center at the end of the tier.  There is an adjacent day room area where inmates enjoy television and play board games, as well as a sally port.

The persons housed on Tier 1-G at the relevant time were for the most part pre-trial detainees, state and federal, and persons awaiting sentence or transfer to other institutions.  The prisoners varied as to the extent of their criminality and prior records, but in Tier 1-G, the Administration had gathered together inmates requiring an additional degree of supervision because of subclinical psychiatric and related problems.  In addition to the two Correction Officers, there were two "trustee" inmates from other parts of the facility who were assigned to observe with particular attention towards suicide watch and assistance in management of the Tier.

Mr. Zoran Teodorovic was in Cell No. 8.  He had been on the Tier for five days.

Mr. Teodorovic, age 46, was six feet tall and weighed approximately 180 pounds. *Gov. Exh. 5.* He was in custody from a local court, under a pending charge of trespass, for failure to make $250.00 bail.  Defendant did not know this or anything else about Mr. Teodorovic, including whether he was regarded as dangerous.  Neither did Reimer.

It was normal operation for the prisoners on either the even or the odd side of the Tier, but not both sides at once, to come out of their cells for a period of two hours of recreation in the day room, followed by the other side.  During the shift, the entire block would be locked down at

10:00 P.M., as well as prior to 5:00 P.M., and the evening meal.

The first witness for the Government was John Mark Reimer, a Sergeant in the Westchester County Department of Corrections, who had both state and federal transactional immunity, and who had also testified as the State's principal witness in the prior state prosecution. Sergeant Reimer testified under immunity that on October 10, 2000, he was on duty as a Correction Officer in the Westchester County Jail and was assigned to Block 1-G, which contained inmates who require more active supervision because of mental health issues. He testified that 1-G was considered a "step-down block" from the Forensic Unit where inmates have been "stabilized."

At approximately 4:30 P.M., Reimer authorized Officer Meade to leave the block to pick up Chinese takeout food and defendant Officer Cote took over from another job location to cover for Officer Meade. Shortly before 5:00 P.M., Reimer directed one or both of the trustees to clean out inmate Teodorovic's cell because Teodorovic had refused to do so. The cell was filthy, cluttered with papers and smelled of urine. As noted earlier, Cote had no familiarity with anybody on the Tier, and Reimer had neither spoken to Teodorovic, nor had any special knowledge about him. While the trustee or trustees were cleaning his cell, Teodorovic stood in the hallway. After the cell cleaning was finished, Reimer, through a loudspeaker from the Bubble, gave Teodorovic an order to return to his cell. Apparently, this order was given twice. When Teodorovic refused to comply, Reimer left the Bubble to deal with the problem. When he told Teodorovic face-to-face to return to his cell, Reimer was "sucker-punched" by Teodorovic

-10-

in his lower cheek area "hard enough to close [his] jaw and. . .[he] bit the inner portion of [his] cheek inadvertently and it created a little blood blister." *Tr. at 70.*

Reimer grabbed Teodorovic and started to take him down in bear hug fashion.  Reimer was six feet two inches tall and weighed approximately 270 pounds.  Observing the fight from the Bubble, Cote ran to the aid of Reimer.  Reimer described that Teodorovic was at that time "wiggling, appeared to be struggling, appeared uncomfortable." *Id. at 74.*  He then testified that "Officer Cote came up along side me and he began to punch inmate Teodorovic in the chest and the head."  He testified that he recalled two punches to the head, two punches to the chest and one slap to the rear of the chest area.  The punches were with a closed fist and the slap was open-handed.  After Reimer said "enough," Cote got up to his feet and began to kick Teodorovic.  The kicks began in the chest area and then proceeded to the head.  He described two direct kicks to the chest and one direct stomp to the face and two direct kicks to the face. *Id. at 74-76.*  At the same time, Reimer testified, Defendant was telling Teodorovic "You never hit an officer -- don't you ever hit a Correction Officer again." *Id. at 77.*  Reimer testified that he was kneeling above Teodorovic "at the waist area, in the middle of his body," that Teodorovic's left hand was underneath his body, and his right hand was free "which I was holding down." *Tr. at 74.*  Although Teodorovic was "still wiggling" in the course of this application of force by Cote, there came a time when he stopped moving and lost consciousness, thereafter remaining in a coma for approximately fourteen months, until he died on December 21, 2001.

With regard to the altercation prior to Cote's arrival on the scene, Reimer testified as

-11-

follows:

Q.  Did you see Mr. Teodorovic's head make contact with the floor?

A.  No.

*Tr. at 72.*

This was in contrast to his testimony in the prior state trial.

Q.  Did you see his head?

A.  Yes.

Q.  Did you see it during the entire time from when you first grabbed him to when you took him to the ground.

A.  Yep.

Q.  At any time, did he strike his head on the ground?

A.  His whole body hit the ground.  His head might have *bounced*, hit the floor, *bumped the floor*.  I was looking at a side angle of his head.  I was looking more at the top.  I was more on top of him.

*State Tr. at 295* (emphasis added).

At the state trial, closer in time to the event by about six years, Reimer testified:

A.  Officer Cote came in the block and got down on his knees and began to strike the inmate.

Q.  Can you be more specific.  What part of his body did Officer Cote use to strike him?

-12-

A.  His hand.  He slapped the inmate on his chest a couple of times and punched him a couple of times with his fist.

Q.  Where did he punch him at?

A.  In his rib cage area.

\*     \*     \*     \*

Q.  What's the next thing that happened?

A.   I said enough, you know, that's it.  And he, Officer Cote, got up and began to kick the inmate.

Q.  Where did he kick the inmate?

A.   First, in the ribs and then stomp to the face and two direct kicks to the face.

*State Tr. at 297.*

Reimer testified that three men, Elias, Perez, and Turner, were on the Tier and not locked

down, and testified that he had told Cote to "watch his back" as he left the Bubble to deal with

Teodorovic, and that he had told Teodorovic twice by loud speaker from the Bubble to return to

his cell.

On cross-examination, during which Reimer was visibly evasive and unresponsive, *see*

-13-

*e.g., Tr. at 136-140; 158-159,* he conceded that he had spent seventeen hours with U.S. Attorney personnel in preparation for trial.  Although this experienced witness was cagey under cross-examination, he did finally confirm that the entire incident from beginning to end involving Cote was approximately thirty seconds.  He also conceded grudgingly on cross that Teodorovic's head "may have" bounced on the floor, as he had testified in the state court case.  He testified that there was only one "stomp" by Cote and conceded that there was a fair amount of resistence by Teodorovic when Cote arrived on the scene.  *Tr. at 131-132.*  He also conceded that in the prior trial, he had used the word "wrestling" in his testimony, referring to Teodorovic's conduct when Cote first arrived on the scene.  *Id. at 136.*

If the testimony of immunized witness Reimer was suspect for a number of reasons - and it was in light of the evasive manner in which he responded under cross-examination, his seventeen hours of rehearsal time with the Government, and his numerous attempted deviations from his testimony in the prior state trial - the next witness, prisoner Gary Sauls, was even worse.  Mr. Sauls was sentenced to four to twelve years for a conviction of attempted murder in 1987.  In 2001 he was convicted of robbery in the second degree, for which he was sentenced to a prison term of seven years.  He has sought treatment at times for anger management, depression and substance abuse.  *Tr. at 210-212.*

According to Sauls, after Teodorovic refused to go into his cell, Reimer "grabbed the guy, spun him around, picked him up and slammed him on the floor." *Tr. at 217.*  During the event, Sauls was in his Cell No. 27 at the other end of the tier.  A small crack existed between

the door and the wall.  Sauls claimed that he was looking through the crack watching the action down by the first four or five cells in front of the Tier, and previously testified that the incident transpired in front of Cell No. 5.  *Tr. at 241-243.*  This was a distance of about 65 to 75 feet. *See Gov. Exhs.1, 1B.*  He testified that he didn't know whether Teodorovic swung at Reimer, but he knew he threw his arms up, and in contrast to all other witnesses, Sauls then testified that Reimer was not punched by Teodorovic.  *Id. at 231-234.*  As to Cote, he testified that "[a]fter he kicked the guy he bent down and he started beating him with his fists.  He hit him in the face.  He hit him in the head.  He hit in the shoulder and in the back." *Tr. at 219.*  "Then, after he was beating on him, then he got up and he started stomping him." *Id. at 220; see also 251-253; 265.* According to prior testimony given by Sauls under oath, he meant what he said when previously testified that Cote stomped Teodorovic in the head "fifteen to seventeen times."  *Id. at 251-252.* Sauls described a series of stomps, in striking contrast to the one "stomp" testified to by Reimer.

Aware of the limited role of the Court in determining credibility in the context of these motions, the Court is nevertheless and totally compelled to conclude that Saul's testimony was blatantly untrue.  Teodorovic's face could not possibly have been stomped on in the manner and as many times as Sauls claimed, and the photographs of him in evidence confirm the exaggeration.  Had there been that many stomps in the leather work-shoes that Cote was wearing, the face of the deceased would have become destroyed and unrecognizable.  While the photographs and expert testimony do reveal trauma to Teodorovic's face and brain, the photographs in evidence as certainly give lie to Saul's testimony of sixteen or seventeen stomps, in contrast to the single stomp reported by Reimer.

While this Court is unprepared to state that the prosecutors presented a witness that they knew would be a liar as to the events which he claimed he saw through a 3/8" - 5/8" crack between the door and the wall, a fair-minded jury would have disregarded Sauls' testimony in its entirety, and he should not testify if a new trial is held.  That the testimony of this witness was incredible as delivered was noted outside the presence of the jury when the Court observed contemporaneously that the witness Sauls was "about the worst I've seen in a long time."  While the Court may not evaluate credibility in connection with the Rule 29 motion, it may be said that Saul's was incredible as a matter of law, based on common sense, and the photographs in evidence.  Teodorovic could not possibly have been stomped on that many times, and the totality of Saul's testimony is rendered suspect.  *See Sanchez*, 969 F.2d at 1414 ("Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation.").


The next Government witness was Paul Perez, who was also a prisoner on the Tier.  This convicted pederast had a long criminal record, and denied that he had been promised anything by the Government.  He testified that he had been asked to clean up the cell of the inmate Teodorovic because it was smelling of urine and Teodorovic had refused to do so.  When he finished cleaning the cell, he heard Reimer twice on the loud speaker telling Teodorovic to return to his cell.  He saw Reimer come from the Bubble into the block to escort Teodorovic back into the cell "and the guy sucker punched him, like up right.  The guy sucker punched him, and that's when Officer Reimer grabbed him and he tried to put him on the floor." *Tr. at 279*.  He described Cote as starting to hit the prisoner in the head and elsewhere with his hands and said that he

"kicked him a lot of times."  This is in considerable contrast to the  testimony of Reimer that there were two kicks to the head.  He testified that the head was being stomped and that the concrete floor vibrated from the kicking.  Perez testified to two punches by Cote and from nine to ten stomps, later increased to "ten to twelve times."  *Tr. at 298*.  Here again, Perez exaggerated the number of stomps even by the standard of Reimer's testimony and here also the number of stomps described by Perez are entirely inconsistent with the post-trauma photographs of Teodorovic.  In stark contrast to Reimer's admission that the entire episode lasted about thirty (30) seconds, Perez testified that Cote was stomping for *fifteen to twenty minutes. Id. at 302-303*.  Perez, like Sauls, was grossly exaggerating, most likely out of malice, and the credibility and weight to be given to his testimony is at best highly questionable.


Derrick Turner was the next Government witness.  He too was a convicted felon.  He was not housed on the Tier, but elsewhere in the Institution, and was working as a paid inmate trustee on 1-G, assigned to keep an eye on other inmates thought likely to commit suicide. *Tr. at 312*. He observed the scene and saw Teodorovic hitting Officer Reimer.  He described his location during the incident as near Cell Nos. 5 and 7 and testified that he was about ten feet away from the incident, which he placed as happening in front of Cell No. 11, not Cell No. 5. *Id. at 315*.  He saw Cote stomping Teodorovic, saw him "slam his head to the ground" and start kicking his head.  *Id. at 316*.  He claimed to have seen Reimer punch the inmate while they were both on the ground and while they were "tussling."  He later amended his testimony to be consistent with his prior written statement, and testified that Reimer had actually punched the inmate once or twice. *Tr. at 321-324*.  Turner described Defendant as stomping the inmate's head between two and

-17-

seven times, but could not recall which side of the head.  He had testified previously that the stomping had lasted for about five minutes.  *Tr. at 331-332.*

*A Jury Verdict of Guilt Beyond a Reasonable Doubt is not Supported by the Evidence.*

The issues presented in this case were really very simple.  In order to convict Defendant, the jury was instructed that it had to recognize that while a person in jail may not be physically assaulted or otherwise abused intentionally by someone acting in an official capacity, Correction Officers are allowed under the Constitution to use reasonable force to defend themselves or to defend another employee of the institution from injury, or in a good faith effort to maintain and restore discipline and order and prevent anybody from escaping or injuring another inmate.  *Tr. at 951.*  The Constitution prohibits only excessive force, or force being used intentionally for an improper purpose such as punishment of prior misconduct, rather than to secure the prisoner, and the jury was so instructed at the appropriate time.  When an inmate is wrestling with an Officer, a Correction Officer may use as much force as is necessary to stop the inmate from becoming a threat, and such decisions are often split-second decisions made while the adrenalin flows.

The trial closely tracked the prior state trial at which Cote was acquitted of an intentional assault upon Teodorovic, but was found guilty of a reckless assault.  It was undisputed that Teodorovic was resisting a lawful order to enter his cell, had punched Reimer, and was at least "tussling" or perhaps "wrestling" with the Correction Officer.  It therefore follows that regardless of any limitations placed on the use of force by a Correction Officer by State law or

-18-

house rules at the jail, under the Constitution Reimer had the right and the duty to use reasonable force in order to subdue his attacker and return him to the security of his cell.  There was at the time a present risk that other inmates loose on the Tier or in the day room might join in the fight and create a full scale riot, as well as the risk that Teodorovic might inflict further injuries on Reimer or somebody else.

It is also clear that defendant Cote had the right and duty to come to the aid of a fellow officer who was involved in combat with an inmate.  This he did at some personal risk.  For all he knew, the prisoner could have been in possession of a shank or other dangerous weapon.  It was a contested issue of fact in the case, and as discussed further *infra*, a point not properly charged to the jury, as to how soon Reimer obtained control over Teodorovic, to the point where, as charged in the Indictment, he was "restrained and under the physical control" of Reimer, during which state of restraint Cote is accused under the federal Indictment of having applied excessive force.

In deciding whether the force applied in this case was excessive and therefore constituted the deprivation of a Constitutional right, jurors were required to consider all the circumstances surrounding the incident, and known to Mr. Cote at the time of the accident.  These included the conditions giving rise to a need for use of force, the relationship between the need for force and the amount of force used, the extent of the injury that was inflicted by him (as distinguished from injuries inflicted by Reimer), and whether the force was applied in a good faith effort to protect Mr. Reimer from injury or to compel Mr. Teodorovic to return to his cell and to restore

discipline, as opposed to being applied in bad faith or for no legitimate purpose.  The jurors would also have to determine first what force was used by Reimer and when, and what force was used by Cote, and when.  The jurors would have to determine when order was restored and when Cote reasonably should have known that no further effort on his part was needed.  This issue should not have been tested by the 20/20 vision of hindsight.

The inmate testimony during trial was so exaggerated and vindictive as to be entirely incredible as a matter of law to the extent that it differs from Reimer's testimony.  Reimer's own testimony should have been viewed with caution since he had been immunized and spared from losing his job, although a participant along with Cote and others of an extensive administrative "cover-up," which immediately followed the incident.  Reimer's testimony alone raises sufficient reasonable doubt as to what injuries were inflicted by himself and what injuries, if any, were inflicted by Cote *after Reimer had restrained and controlled the prisoner.*

There is no dispute that Mr. Teodorovic suffered head injury and brain trauma, but according to the credible evidence adduced at trial, the damage inflicted by Cote was to the right side of Teodorovic's face and head, as is fairly depicted in the evidentiary photographs.  *See Gov. Exhs. 123; 125; 128.*  Certain of the photos reveal a marked disparity between the injuries incurred on his left and right sides of the face and head. *See e.g., Gov. Exh. 133.*  While force applied to the right side could result in some damage to the left side, as it was against the floor, the more severe injuries to the *left* side of the head and to the brain were more than likely incurred when Reimer first "took him down" and his head "bounced" against the hard concrete

floor, an event which Reimer conceded most grudgingly in cross-examination.  As earlier

discussed, all the alleged stomping would have been facially obvious and more evidently

revealed on the right side of the face.  As earlier noted, the repeated stomping alleged by most of

the Government witnesses, in contrast to the one stomp asserted by Reimer, would have rendered

Mr. Teodorovic unrecognizable, regardless of by what application of force the brain trauma

occurred.  While Cote undisputedly applied some degree of force, it cannot fairly be concluded

on the totality of the testimonial and other evidence that it was Mr. Cote's applications of force,

rather than the initial blow to Mr. Teodorovic's head imposed by Reimer's act in taking him

down, that caused the brain trauma.

Finally, the evidence was not sufficient to support a finding of specific criminal intent by

Cote.  The State Court jurors got it right when they refused to find criminal intent on a nearly

and materially identical record, and were probably right in their verdict that Cote recklessly used

more force than hindsight suggests was necessary.  This reckless misconduct, for which the state

has convicted and punished Cote, does not rise to the level of a violation of 42 U.S.C. § 242.

Defendant is accordingly entitled to a judgment of acquittal on the grounds stated above.

Importantly, the allegedly unconstitutional events charged in the Indictment did not occur

until Teodorovic "was restrained and under the physical control of" Reimer.  *Indictment ¶ 3.*

Wholly apart from proving the statutory elements of the crime, the Government must prevail in

accordance with the allegations in the Indictment.  This point was not made as clear in the jury

charge as it probably ought to have been.  An essential factual element injected in the

Indictment, in addition to the statutory elements, is that the physical violence must be proved to

have been inflicted on Teodorovic by Cote while Teodorovic was restrained and under the

physical control of Reimer.

"[A] party can only be tried upon the indictment as found by such grand jury, and

especially upon all its language found in the charging part of that instrument." *Ex parte Bain,*

121 U.S. 1, 9-10 (U.S. 1887), *overruled on other grounds, see e.g. United States v. Cotton*, 535

U.S. 625, 631 (U.S. 2002)("Insofar as it held that a defective indictment deprives a court of

jurisdiction, *Bain* is overruled.").

> The proposition that a defendant cannot be convicted of an offense different from that
> which was included in the indictment was broadly declared in *Bain* ... [and this] aspect of
> *Bain* has been reaffirmed in a number of subsequent cases. *See, e. g., United States v.
> Norris*, 281 U.S. 619, 622 (1930) (citing *Bain* for the rule that "nothing can be added to
> an indictment without the concurrence of the grand jury by which the bill was found").

*United States v. Miller*, 471 U.S. 130, 142-143 (U.S. 1985).  Our Supreme Court has also held:

> The precise manner in which an indictment is drawn cannot be ignored, because an
> important function of the indictment is to ensure that, "in case any other proceedings are
> taken against [the defendant] for a similar offence, . . . the record [will] [show] with
> accuracy to what extent he may plead a former acquittal or conviction." *Cochran v.
> United States*, 157 U.S. 286, 290 (1895), quoted with approval in *Russell v. United
> States*, 369 U.S. 749, 764 (1962); *Hagner v. United States*, 285 U.S. 427, 431 (1932).

*Sanabria v. United States*, 437 U.S. 54, 65-66 (U.S. 1978).

It is the province and duty of the jury to acquit or convict only in conformity with the factual and legal allegations charged in the Indictment.  In this case, neither the Defendant, nor the Government asked the Court in its charge to instruct the jury that in order to convict the Defendant, they must also find, in conformity with the terms of the Indictment, that any excessive force rising to the level of a constitutional violation was used by Defendant while Mr. "Teodorovic was restrained and under the physical control of [Reimer]."  In other words, the jury should not have convicted Defendant if what they believed to be excessive force was applied by Cote at any time *before* Teodorovic was restrained and under the physical control of Reimer.

On this issue, the jury instructions were regrettably incomplete, and no exception was taken by the parties to the charge as delivered.  *See Tr. at 959*.  The Supreme Court, however, has noted that it will take note of such errors, even where no exception is taken, "where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest."  *Screws v. United States*, 325 U.S. 91, 107 (U.S. 1945).

This case is unlike those in which multiple predicates for guilt are offered to substantiate a single count of an indictment, in which cases our Court of Appeals has held that as long as the jury receives a standard instruction as to unanimity, it is not reversible error if a trial judge fails to charge the jury that it must be unanimous as to the specific act that serves as the basis for a guilty verdict.  *See, e.g., United States v. Peterson*, 768 F.2d 64, 66-68 (2d Cir. 1985) (Friendly, J.) (affirming despite trial judge's failure to charge jury that it must be unanimous about which

particular bag of drugs served as basis for conviction for possessing heroin with intent to distribute it); *see also United States v. Natelli*, 527 F.2d 311, 324-25 (2d Cir. 1975) (affirming despite trial judge's refusal to charge jury that it must be unanimous about what particular false statement served as the basis for conviction for securities fraud).

In this case, there was one specific factual allegation and one crime charged on the basis of that factual allegation. The concern here is not that Defendant was inadequately forewarned of the legal charge against him, which is often the case in a situation involving a constructive amendment or a variation to an indictment, but is whether Defendant was properly convicted of an intentional crime within the confines of the factual allegations in the Indictment.  Although the statutory elements of the crime alleged were properly defined and explained by the Court, the Court and counsel for the parties failed to ensure that the jurors recognized that under the terms of the Indictment, they also had to determine 1) when Reimer had restrained and was in physical control of Teodorovic, in relation to when Cote entered the scene and applied any force; and 2) whether the force thereafter used was excessive under all of the circumstances then known to Cote and under the law as explained.[2]  This deficiency goes to a fundamental component of the specific criminal act charged, although not to the legal elements of the crime *qua* crime.  It is by no means certain that the severe injuries inflicted upon Teodorovic, to the extent they were not inflicted when Reimer bounced his head off the floor, were inflicted *after* the victim was restrained and under the control of Reimer.

---

[2] Most indictments filed in this District merely identify the parties, the date and location and the statutory elements of the offense charged.

There was no testimony to the effect that when Cote arrived on the scene, he waited until Mr. Teodorovic was subdued and under the control of Reimer.  Indeed, the testimony, cagey as it was by Reimer, reveals that when Cote arrived on the scene, an active struggle was underway, and that Reimer had not already achieved "restraint" and "physical control" of Teodorovic, as would be required for conviction under the terms of the Indictment.  The Government's primary witness testified that when Cote came on the scene, Teodorovic was "wiggling" and "wrestling" and "appeared to be resisting [Reimer's] attempts to hold him down." *Tr. at 139.*  He had earlier testified that Cote came on the scene while Teodorovic was wrestling with Reimer and by his actions manifesting that he "didn't like what [Reimer] was doing."  *Tr. at 137.*  Indeed, Reimer testified that Cote came on the scene *before* Reimer had straddled Teodorovic. *Tr. at 139.*

It is axiomatic that if a defendant is convicted on a theory that is not alleged in an indictment, the defendant's due process rights are violated.  Clearly, Mr. Reimer's testimony itself belies the contention that Mr. Teodorovic *was* restrained or under control when Cote first entered on the scene.  If the jury believed Mr. Reimer's testimony, which they must have, then they *still* should not have convicted Cote for using excessive force, because the Indictment charges Cote's conduct only after Teodorovic was "restrained and under the physical control" of Reimer.

The omission now raised *sua sponte* by the Court is that it did not charge, and the parties did not object to the failure to instruct the jury that they must acquit or convict Mr. Cote in specific conformity to factual and legal charges in the Indictment.  Considering the totality of the

circumstances and the evidence adduced at trial tending to suggest, if not confirm, that

Teodorovic was not under control when Cote applied force, a serious injustice resulted, as it is

entirely possible, if not probable, that a jury would not have convicted if adequately instructed

that a conviction must conform to the factual and legal allegations of the indictment.

 

The Court is not satisfied that competent, satisfactory and sufficient evidence in the

record supported the jury's finding of guilt beyond a reasonable doubt.  In this case in which

much of the testimony was patently incredible and defied physical realities portrayed in the

photographs, support is lent for a new trial, based on real concern that an innocent person may

have been convicted.  This conclusion is based on the totality of the facts of this case, and is

further supported by the fact that the state court jury acquitted Cote of intentional criminality on

the same body of evidence.  For these reasons, and the additional reason that the jury was not

properly charged to decide on whether there was intentional criminal conduct in conformity with

the facts of the Indictment, namely, intentional criminal conduct by Cote after Teodorovic was

already restrained and under Reimer's control, the Defendant should be acquitted or entitled to a

new trial, in order to prevent a manifest injustice.

*The Statute of Limitations Waiver*

This Court, with what turns out to have been foresight, raised with counsel the issue of

the Statute of Limitations at a pretrial hearing on April 20, 2006.  The following colloquy

occurred:

The Court:     As I understand it, the alleged civil rights violation occurred on

October 10, 2000?

Mr. Epstein (Defense Attorney): Yes Sir.

The Court:        And the Indictment was filed February 6, 2006?

Mr. Epstein:      Yes Sir.

The Court:        What does that mean to you?

Mr. Epstein:      Are you talking about statute of limitations, Judge?

The Court:        I'm talking about days, months and years which add up to more than five.

Mr. Epstein:      Yes.

The Court:        All these motion papers, and nobody from either side has addressed such
                  an obvious, apparent thing on a case where the fellow is already convicted
                  in the State Court and did his time.

Mr. Epstein:      Your Honor, there was a waiver - -

The Court:        Oh, good for you.

Mr. Epstein:      - - entered into by Mr. Cote.  He was represented [by his prior attorney]
                  who reached some kind of agreement with the Government to waive the
                  statute of limitations.

The Court:        I always understood a criminal defendant didn't waive anything but the
                  flag.

The background of the tolling agreement earlier described is just one of a number of

unusual facts in the history of this case.  It is clear that the request for the first of two tolling

agreements came from the Government.  It is hard to imagine how the Government may request

-27-

a tolling agreement (so close to the time bar) without creating an inherently coercive situation.

A defendant who, after having been informed by a respected Government official that he would

not be re-prosecuted - and who in the eleventh hour is horrified to hear that he *may* after all be

 re-prosecuted, with an additional charge of resulting death - could not afford to gamble on

whether the prosecutor might or might not succeed, in the single day remaining (a Thursday), in

getting a quorum of the Grand Jury present, and having an agent available and on time to read in

enough hearsay from Forms 302 to support an indictment.  While former Judge Wachtler

provides authority for the premise that "a Grand Jury would indict a ham sandwich," this Court

cannot assume that the waiver was inconsequential, simply because, as the Government

apparently claims now, had the waiver been refused, it would have been able to have its work

done inside of one day, and obtained an indictment which would not have been time-barred.  If

this were really so, why ask for the waiver?


        Our Court of Appeals has held that the statute may be waived in the context of a guilty

plea or when the defendant advised by counsel sought the waiver.  *United States v. Doyle,* 348

F.2d 715, 718-19 (2d Cir.), *cert. den*. 382 U.S. 843 (1965); *United States v. Parrino,* 212 F.2d

919 (2d Cir. 1954), *cert. den*. 348 U.S. 840(1954); *see also United States v. Sindona*, 473 F.

Supp. 764 (S.D.N.Y. 1979).  Defendant argues that the Government improperly solicited  the

waiver by informing then Defense Counsel that if he did not waive the statute of limitations,

Cote would be indicted for causing the death of Teodorovic, a Count carrying a potentially far

greater sentence.  The Government asserts that the waiver was voluntarily made with the advice

of competent counsel and with a distinct benefit conferred upon Defendant, namely the benefit of

not being charged with a violation that resulted in death.[3]

Under the bizarre scenario through which these events evolved, the decision to waive the statute of limitations defense made a mere matter of days before it was set to expire could not possibly have *felt* voluntary - regardless of whether it was made with the consultation of competent counsel - after being told that there would be no further prosecution, and then being told that the earlier guarantee was wrong, particularly here, where the alternative to waiver was an eleventh hour subjection to being charged with a felony resulting in the death of Mr. Teodorovic.

In light of the tremendous risk inherent in a refusal of the waiver, and the minimal time available for deciding on that risk, the Government's eleventh hour solicitation of the first waiver was unjustly coercive.  That there was so little time, was not the fault of Defendant or his then attorney.  By the time of the second waiver, which was requested by the defense, the damage was done.

On the additional basis of the inherently coercive conditions under which the statute of limitations was avoided, Defendant is entitled to the relief sought in order to prevent a manifest injustice.

---

[3]In view of the lapse of fourteen months between the incident and the death, and because the autopsy lists sepsis and pneumonia as additional causes of death, this would have been a charge difficult to maintain. *See Schilling Decl., Exh. H.*

*Double Jeopardy*

At a pretrial stage of the case, the Defendant sought to dismiss the Indictment on the ground that it violates the Double Jeopardy clause of the U.S. Constitution, because he was previously indicted and tried in the state courts of New York on the same facts.  He was acquitted of the Count of Assault in the First Degree, the Count requiring specific criminal intent, and was convicted on a lesser included charge for reckless conduct.  On April 20, 2006, in an oral decision, this Court held (Tr. at 21):

> Defendant notes that, while the dual sovereignty doctrine set forth in United States against Lanza, 260 U.S. 377, at page 382, decided in the 1920s, appears to permit the second prosecution notwithstanding double jeopardy implications, he points to a very serious criticism of the doctrine included within our Court of Appeals' decision in United States against All Assets of GPS Automotive Corporation, 66 F.3d 483, at page 496, decided in 1994, a case in which Circuit Judge Calabresi wrote the majority opinion and also wrote a concurrence.
>
> In his concurrence, Judge Calabresi, in very vivid language, exhorts the Supreme Court to give renewed attention to the doctrine of dual sovereignty, which, in certain cases, appears to undermine the double jeopardy clause of the Fifth Amendment. And quoting Judge Calabresi, he says, 'A new look by the High Court at the dual sovereignty doctrine and what it means today for the safeguards the framers sought to place in the double jeopardy clause would surely be welcome."  That's a quotation at page 497.
>
> Judge Calabresi observed, and this Court agrees, that one of the most obvious historical bases for the vitality of the dual sovereignty doctrine is "the danger that one sovereign may negate the ability of another adequately to punish a wrongdoer by bringing a sham or poorly planned prosecution or by imposing a minimal sentence."
>
> There's no indication in this particular case that that's what happened.  There's every indication here that the State conducted a good-faith, competent, and comprehensive trial on the very same underlying facts as those presented in this case.  And there is no apparent sign or hint of any collusion or negation of the federal claim related to the state trial.  This case clearly, in my view, illustrates the argument in favor of a resolution more deferential to the Constitutional guaranty that no person shall "be

subject for the same offense to be twice put in jeopardy of life or limb," found in the Fifth Amendment to the Constitution.

While this Court appreciates the spirit of Judge Calabresi's concurrence in the All Assets decision, it is, nonetheless, presently established in this Circuit that the doctrine of dual sovereignty remains viable.  And under the dual sovereignty doctrine, a federal indictment charging conduct that was previously the subject of a state prosecution simply does not implicate the double jeopardy clause.  That's the holding of United States against Giovalli, 945 F.2d 479, at page 492, decided by the Second Circuit in 1991.  See also United States against Sewell, 252 F.3d 647, 651, decided by the Second Circuit in 2001, holding "a defendant in a criminal case may be prosecuted by more than one sovereign without violating any principles of double jeopardy." That case, in turn, quotes United States against Arena, 180 F.3d 380, at page 399. And the matter is also discussed fully in United States against Pacelli, at 448 F. Supp. 234, decided in 1978 by Judge Pollack.

And this Court, accordingly, is constrained, on the present state of the record, to conclude that the double jeopardy clause may not serve as a basis for dismissing this indictment against the defendant.

I note, in passing, that Judge Calabresi attributes the problem as having arisen out of the national prohibition laws in the 1920s, which certain states attempted to negate. With all respect to Judge Calabresi, I think the problem goes back to Reconstruction, where persons committing crimes against newly freed slaves in the South were prosecuted in the state courts in order to prevent the United States from enforcing the Civil Rights Law to protect newly freed slaves in the South.

But, regardless of whether it's that or both causes are historically part of the doctrine, the law is still as indicated, and, as conceded by Judge Calabresi, and the Court believes that this defendant was correct in making the motion, in order to protect his record if this might turn out to be the case where the Court would deal further with this problem.  But that particular motion, the Court is constrained to deny, although I believe Judge Calabresi to be right, and I think it ultimately is an issue which will have to be re-examined on the Supreme Court level.

This Court went on in that oral decision to reject the Government's argument that under the *Blockburger* test, *Blockburger v. United States*, 284 U.S. 299 (1932), Double Jeopardy, if available, would not bar the retrial of this case.  The Government argued that there were separate

elements, namely, that the Defendant acted under color of state law and second, that he willfully deprived the victim of a Constitutional right.  The Government was incorrect as to this argument. The action under color of state law is a jurisdictional hook and the element of this case is not that he willfully deprived the victim of a Constitutional right, but that he willfully took action or refused to act that had the effect of depriving the victim of a Constitutional right.  *See e.g., Screws, supra.*

This Court holds the same view as stated on April 20, 2006, and that view is further underscored by the comments of other Courts similarly constrained, such as *United States v. Wilson,* 413 F.3d 382 (3d Cir. 2005), which also criticizes the dual sovereignty rule in both the majority and dissenting opinions.  Meaningfully, Judge Aldisert recognized in his dissent, *inter alia,* that there was no indication in the record of the *Wilson* case, that the Defendant was forewarned that even if he were to prevail in his state proceedings, that he would still have to face a second federal prosecution.  *Id. at 395.*  The same is true in this case, and if ontologically possible, it's even *more true* in this case, in which Defendant was told by an appropriate representative of the Government that indeed he would *not* be subject to further prosecution.  In *Smith v. Massachusetts*, *supra*, the Supreme Court held that the Double Jeopardy clause was violated where a state trial judge at the end of a case reconsidered an acquittal it had granted on one charge midway through the trial.  Like Judge Aldisert, this Court finds it important that the Supreme Court noted its consideration that "the facts of this case gave the petitioner no reason to doubt the finality of the state court's ruling." *Smith*, 543 U.S. at 470.

This case clearly affords an opportunity, if not a requirement, for reconsideration of the issue presented in cases such as *United States v. Wilson, supra*, and the concurring opinion in *United States v. All Assets of GPS Automotive Corp.*, 66 F.3d 483 (2d Cir. 1994).

*Bartkus Exception*

*Dicta* in *Bartkus v. Illinois,* 359. U.S. 121, 123-24 (1959), suggests that there is an exception to the Dual Sovereignty Rule when, in a prosecution by the state following a federal acquittal, sufficient evidence supported the claim that a "[State] in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of [double jeopardy]."  Cote now argues that under *Bartkus* he is entitled to an exception from the dual sovereignty doctrine, because of the close interrelationships between the state and federal authorities in connection with Cote's prior trial and conviction in the state court.

The record does show that the FBI was "monitoring" the state trial as early as November 20, 2000, but the Special Agent solely assigned to the investigation from November 2000 through January 3, 2003, avers that at no time did she direct, advise or assist in the state investigation or prosecution.  She also avers that she did not actively investigate the allegations during the pendency of the state prosecution, but merely "monitored" its progress, by way of approximately monthly conversations with Robert Neary, the ADA then handling the state prosecution.  Only after Cote was sentenced did she receive documents or materials from the state files.  *See McGovern Decl.*  On January 3, 2003, Special Agent Cynthia Deitle assumed

responsibility for the case. *Id.*

Neither the defense nor this Court has an investigatory facility to develop cause to suspect the veracity of Agent McGovern's averments.  Yet, the strange facts developed in this case cause  wonder as to how the Assistant District Attorney felt when being contacted on a monthly basis by the FBI as to this particular one of his many pending cases.  Did this "monitoring" inhibit or otherwise affect his prosecutorial discretion?  Could such monitoring alone amount to some level of federal oversight?  On a more complete record, evidence as to this issue could possibly negate the application of the dual sovereignty principle.  There is no "smoking gun" in this case, to suggest that the United States went so far as to use the state prosecution as a "tool," within *Bartkus*.  Indeed, there was no reason for the Government to do so, since it did not have to wait for the state case to be resolved.  Despite the "monitoring" and the peculiar turn of events surrounding the ultimate decision to re-prosecute Cote in federal court, there is insufficient evidence in the record to support the application of *Bartkus* to this case.

*Petite Policy*

The *Petite* policy was adopted by the Department of Justice following the case of *Petite v. United States,* 361 U.S. 529 (1960).  The policy precludes the initiation or continuation of a Federal prosecution following a prior state or federal prosecution, based on substantially the same acts or transactions, absent a finding that the prosecution serves "compelling interests of

federal law enforcement." See *Thompson v. United States*, 444 U.S. 248 (1980).

Even if permission to re-prosecute Cote's case was ultimately obtained through the proper channels and in accordance with the agency rules, it is certainly clear that the *spirit* of the Petite Policy was violated in this case.[4]  Unfortunately, Defendant cannot gain relief on that ground from this Court, as there is well established precedent that the *Petite* policy does not create any substantive or procedural rights for a defendant.  *See e.g. United States v. Catino*, 735 F.2d 718, 725 (2d Cir. 1984), *citing United States v. Ng*, 699 F.2d 63, 71(2d Cir. 1983) (the Petite Policy is merely an internal guideline for exercise of prosecutorial discretion and is not subject to judicial review).  This is not a case where the state prosecution of Cote was inadequate or ineffectual.  Cote was charged and prosecuted by New York State for a serious felony.  A trial jury in New York, acting in good reason, convicted him of a lesser included offense, reckless rather than intentional assault.  He received and served a jail sentence imposed by a respected New York Supreme Court Justice, notwithstanding that the New York State Department of Probation had recommended a non-custodial sentence.

It is passing strange that the Government waited so long to seek vindication, if indeed there was an unrequited compelling federal interest in the case.  It is also passing strange that prior defense counsel was advised that the investigation was closed and later told this information was a "mistake."  The "mistake" is not explained and experience suggests that

---

[4] For the letter killeth; but the spirit giveth life.  II Cor. 3:6 (King James Version).

neither the Department of Justice nor the United States Attorney in this District are noted for

making such mistakes.  It may be inferred that the statute of limitations would have run had

defense counsel not requested a closing letter.  Finally, if there were an unsatisfied federal

interest arising out of the unfortunate death of Teodorovic after Cote's prior sentence was

served, how could it be that the Government would see fit to bar by agreement any charge of a

violation resulting in death, in exchange for the Defendant's waiver of the statute of limitations?

In this Circuit, the *Petite* Policy is not regarded as anything more than a pious platitude

directed to the conscience of the prosecutors.  Our Court of Appeals has held that it is merely an

internal Justice Department guideline self-imposed to propitiate Congress, and its application not

subject to judicial review.  This conclusion, according to the practical analysis of the late Judge

Milton Pollack in *United States v. Persico*, 623 F.Supp. 842, 876 (S.D.N.Y. 1985), is so because

"to hold the policy legally enforceable would be to invite the Attorney General to scrap it, which

would hardly be in the public interest."

It is hard to accept that once such a policy, even if not required by the Constitution, has

been put forward in writing by the Department of Justice, basic concepts of fairness, due process

and equal protection of the law, give no relief at all to a person with respect to whom such a

formal policy has been violated.  Notwithstanding the obvious risk cited by Judge Pollack, there

is fair ground in this case for reconsideration of this issue also.  Although the prosecutorial

conduct in this case certainly invites question in light of the *Petite* policy, current caselaw does

not provide a basis upon which relief may be granted.

## Conclusion

The Court concludes that the verdict was not fairly based on the evidenced presented at trial and was not in proper conformity with the Indictment.  The Court also concludes, based on its direct observation of the entire trial, that the interests of Justice were not served by the verdict, and that if on appeal Defendant is deemed not entitled to a judgment of acquittal, in contrast to this Court's view, then he is at least entitled to a new trial.

The motion for a judgment of acquittal under Rule 29(c) is granted.  The motion for a new trial under Rule 33 is conditionally granted if the judgment of acquittal is reversed.  The judgment is stayed pending Appellate finality.

X

X

X

X

SO ORDERED.

Dated: White Plains, New York
        April 3, 2007

_____
Charles L. Brieant, U.S.D.J.

SO ORDERED.

Dated: White Plains, New York
      April 3, 2007

<u>                                       </u>
Charles L. Brieant, U.S.D.J.